On Rehearing Ex Mero Motu
 

 THOMPSON, Presiding Judge.
 

 The opinion of July 31, 2009, is withdrawn, and the following opinion is substituted therefor.
 

 S.T.W. (“the mother”) appeals from a judgment terminating her parental rights to H.S.A. (“the child”).
 
 [1]
 
 In its February 9, 2009, judgment, the Franklin Juvenile Court set forth a comprehensive recitation of the evidence presented at the termination hearing and its factual findings and legal conclusions reached after its consideration of the evidence. Our review of the record indicates that the evidence supports the juvenile court’s factual findings and legal conclusions. We, therefore, incorporate that judgment, in its entirety, as part of this court’s opinion.
 

 “The petition to Terminate Parental Rights [to the child] was filed on November 29, 2007. The mother of the child is [S.T.W.]. She was served with the petition on December 10, 2007. The father of the child is [A.A. (sometimes hereinafter referred to as ‘the father’) ]. He was served initially by publication on August 27, 2008, at a time when his whereabouts were unknown. He was later served by personal service on ....
 

 “The child came into the jurisdiction of the Juvenile Court on October 18, 2006, when she was four days old as a result of a Dependency Petition filed by [the Franklin County Department of Human Resources (‘DHR’) ]. This court has had numerous hearings and reviews of the custody of this child. Both parents were present at the shelter care hearing and agreed that DHR would have temporary emergency custody of the minor child. The child was born to [the mother] during her marriage to [J.W.]. At the adjudicatory hearing on December 21, 2006, both [the mother] and [A.A.] were present and as a result of genetic testing, [A.A.] was adjudicated the father of the minor child. This
 
 *142
 
 Court gave temporary custody of the minor child to DHR. At the hearing on February 27, 2007, both parents were present and agreed that DHR continue to have temporary custody of the minor child. At that time the father indicated that he would be filing a petition for custody. At the review hearing on August 1, 2007, neither parent appeared. The Court ordered that the child continued to be dependent and DHR continued to have custody of the child. A permanency hearing was held on October 29, 2007. At that time, both parents were present. They agreed that the child remained dependent and agreed with the permanency plan of reunification of the child with the parents. At the time of the permanency hearing on June 30, 2008, neither parent was present with the order reflecting that their whereabouts were unknown. The court approved permanency plan was foster-parent adoption. The initial termination hearing was set on October 27, 2008, and neither parent was present. The hearing was continued. At the next hearing date, ... the mother failed to appear. The father appeared and requested an attorney to represent him. The hearing was held ....
 

 “Based on the testimony presented, DHR was contacted by the hospital on October 16, 2006, two days after the child was born. DHR worker, Stephanie Pinkard, visited the mother and baby at the hospital. The mother had admitted using marijuana during her pregnancy, but she tested negative for drugs at the hospital. The mother did not have a home to go to with the baby and did not have any items necessary to provide care for the baby. The mother was married to [J.W.] at the time of [the child’s] birth, but the mother alleged that [A.A.] was the biological father. [J.W.] was in the Franklin County Jail charged with Capital Murder of [C.W.], who was the infant son of [J.W.] and [the mother], [The father] was at the hospital but he did not have a plan for caring for the baby. He was working at that túne. DHR filed the petition for custody due to the death of [C.W.] while in [the mother’s] care, the mother’s history of drug and alcohol abuse, and neither parent having a home for the baby. All of [the mother’s] other children were in DHR custody at that time.
 

 “[The mother] has given birth to five children. They are: [K.J.], [L.N.], [D.W.], [C.W.], and [the child]. At the time of the [termination] hearing, the mother did not have custody of [K.J.], [L.N.], and [the child].
 
 [2]
 
 Parental rights to [D.W.] were terminated and [C.W.] is deceased.
 

 “[The child] was taken home from the hospital by foster parent, [K.G.]. [K.G.] is the adoptive parent of [D.WJ. She took [D.W.] home from the hospital in June 2004, after his birth. [K.G.] worked with the parents during visits and would provide assistance to the parents when they called for help with [the child]. [KG.] has not had any direct communication with the parents since June 2007.
 

 “Stephanie Pinkard began working with the parents to reunify them. DHR recommended that the mother attend Freedom House Intensive Outpatient Program. Freedom House reported that she would not attend the sessions regularly. Ms. Pinkard also sought names for relative placement. Stepha
 
 *143
 
 nie Pinkard was given the name of a person in Mississippi and that person stated that she did not want custody of the child. [The father] gave his father’s name, but the paternal grandfather had health problems that prevented him from seeking custody of [the child].
 

 “Laura Johnson, who was employed at Family Options, began working with the parents on December 13, 2006. The parents were not married to each other, but were residing in the same household. Ms. Johnson met with the parents and set goals for them. She saw them three days in a row initially. At that time, [the father] was employed, but [the mother] was not employed. [The father] became unemployed while she was working with them. By January 5, 2007, he was still unemployed and had been for two to three weeks. She gave both parents applications for jobs through Kelly Services and neither of them followed through with the applications. [The child] was visiting in the home for three to four days including overnight. Ms. Johnson had the opportunity to observe the parents interact with the child. While she was in the home, the child was in the bouncy seat most of the time and [Johnson] observed very little interaction between the parents and child. During times that they had the child they would not have money and would have to call the foster mother to give them formula and diapers to care for the child. Ms. Johnson worked with them a total of sixty (60) hours. Family Options withdrew from working with them on January 5, 2007, due to their instability during this time and their experience during five or six prior interventions with [the mother] and her other children.[
 
 3
 
 ]
 

 “Betsy Puckett became the foster care worker on April 5, 2007. She had worked with [the mother] previously with her other children. The parents’ goals were steady employment, consistent visitation, housing, and no drug or alcohol use. During the time Ms. Puckett began working with the parents and until October 31, 2007, the parents had numerous jobs. The mother was employed approximately half the time and the father was employed less than half the time. The parents were having visits with the child in their home until June 7, 2007. On that day [the father] was arrested for Domestic Violence. [The child] was in the home at the time. Both parents admitted to the worker that they had been drinking that night.[
 
 4
 
 ] Later in the hearing, [the father] testified that he was ordered to attend the P.E.A.C.E. program, but he failed to complete the program. He received a suspended sentence and a fine. After the domestic dispute, visitation was changed to supervised by the paternal grandfather. After that date, the worker had very little contact with the parents and could not confirm housing or employment. At a meeting with the parents on October 26, 2007, Ms. Puckett told the parents that DHR would move to terminate their parental rights. [Puckett] left DHR on October 31, 2007, and has not had any contact with the [parents] since that time.
 

 
 *144
 
 “[The father] testified that since October 2007, he has seen [the child] less than ten times. He testified that the last [scheduled] visit he [had] with the child was eleven months ago and he has seen her once since then during October 2008.[
 
 5
 
 ] [The father] has never paid any support for the benefit of the child. He has lived in five places during the last eighteen months and has not had steady employment. He has been arrested for four more criminal offenses since the domestic dispute in 2007. Those charges are pending and are: Domestic Violence in the third degree; Menacing; Robbery in the first degree; and Manufacturing Methamphetamine in the first degree. He is now living with his father, mother, brother and sister where he sleeps on the couch. He stated that he was now ready to be a parent to [the child].
 

 “[The mother] testified that she moved to Mississippi in January 2008, and continues to live there. She and [the father] separated on October 31, 2008. She is employed as a roofer and has been since October 2008. She has not provided any financial support for [the child]. She has been under a court order to pay support for her two older children, [K.J.] and [L.N.], and has an outstanding warrant for her arrest for failure to pay this court-ordered support. She testified that she has not seen [the child] since December 25, 2007. She promised the Court that she would pay her past-due support when her boyfriend’s tax refund came in. She testified that she feels like she did a ‘horrible thing.’
 

 “Based on the testimony and evidence presented, the court finds from clear and convincing, competent, material and relevant evidence that [the mother] and [the father] are unable to discharge them responsibility to and for the care [of the child], and specifically finds as follows:
 

 “1. That reasonable efforts by [DHR] leading toward rehabilitation of the mother have failed.
 

 “2. [The mother] and [the father] have failed to maintain regular visits with [the child].
 

 “3. [The mother] and [the father] have failed to pay any support for the child when they had the ability to do so.
 

 “4. [The mother] and [the father] have failed to provide for the material needs of [the child].
 

 “5. There are no viable options in placing the children with other relatives.
 

 “6. [The mother] and [the father] failed to maintain consistent contact or communication with the child.
 

 “7. [The mother] and [the father] by their actions lacked the effort to adjust their circumstances to meet the needs of the child in accordance with agreements reached with DHR and Family Options.
 

 “The Court also finds from clear and convincing evidence that all viable alternatives to the termination of parental rights have been considered and it is in the best interest of [the child] to terminate the parental rights of [the mother] and [the father].
 

 [[Image here]]
 

 “Therefore, the court does hereby ORDER that the parental rights of [the mother] and [the father] as to [the child] are hereby TERMINATED
 

 
 *145
 
 On appeal, the mother argues only that the juvenile court erred in concluding that the Franklin County Department of Human Resources (“DHR”) had made reasonable efforts toward reuniting her with the child. Section 12-15-G5(g)(2), Ala.Code 1975, required that, generally, “reasonable efforts” be made to reunify parents and children and that the juvenile court enter orders ensuring that such efforts are being attempted.
 
 [6]
 
 However, “reasonable efforts” toward reunification are not always required.
 
 [7]
 
 Subsection (m) of § 12-15-65 provided, in pertinent part:
 

 “Reasonable efforts shall not be required to be made where the parental rights to a sibling have been involuntarily terminated or where a court of competent jurisdiction has determined that a parent has done any of the following:
 

 “(1) Subjected the child to an aggravated circumstance, including, but not limited to, abandonment, torture, chronic abuse, substance abuse, or sexual abuse.
 

 “(2) Committed murder or voluntary manslaughter of another child of such parent.
 

 “(3) Aided or abetted, attempted, conspired, or solicited to commit murder or voluntary manslaughter of another child of such parent.
 

 “(4) Committed a felony assault which resulted in the serious bodily injury to the child or another child of such parent. ...”
 

 Also, § 26-18-7(a)(l), Ala.Code 1975, provided that if parents have abandoned the child “proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.”
 
 [8]
 

 The juvenile court specifically determined that the mother’s parental rights to one of her children, D.W., have been terminated; the record supports that finding. Also, we note that the mother has lost custody of two of her other children and that another child died at the hands of her husband, J.W.
 
 [9]
 
 Thus, given the facts of this case, the juvenile court was not required to consider whether reasonable efforts had been made to reunite the mother with the child. § 12-15-65(m). We note that the evidence concerning DHR’s and Family Options’ previous efforts to assist the mother tends to indicate that previous attempts to reunite the mother with her other surviving children were unsuccessful. In spite of her past experiences in a termination-of-parental rights case, the mother failed to maintain contact with DHR social workers and failed to visit the child for more than a year.
 
 [10]
 
 Given the facts of this case and the authority of § 12-15-65(m),
 
 *146
 
 we cannot say that the mother has demonstrated that the juvenile court erred in determining that DHR had met its burden with regard to terminating her parental rights.
 

 ON REHEARING EX MERO MOTU: OPINION OF JULY 31, 2009, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
 

 PITTMAN and BRYAN, JJ., concur.
 

 THOMAS and MOORE, JJ., concur in the result, without writings.
 

 [1]
 

 . A.A., who was previously adjudicated the father of the child and whose parental rights were also terminated, has not appealed.
 

 [2]
 

 . A reference in the record indicates that K.J. and L.N. have been placed, together, in the custody of their grandparents.
 

 [3]
 

 . Johnson testified that Family Options decided to stop working with the mother because it had offered her services on five or six previous occasions and those services had not been effective in assisting the mother to reunite with her children.
 

 [4]
 

 . In addition, both parents admitted to having taken the child briefly to Tennessee, although each knew that the child was not permitted to be removed from Alabama.
 

 [5]
 

 . A.A. testified that, in October 2008, he happened to see the child at a restaurant where she was eating with her foster parents; that was not a scheduled visit.
 

 [6]
 

 . By Act No. 2008-277, Ala. Acts 2008, the Alabama Legislature, among other things, amended and renumbered § 12-15-65 and enacted the Alabama Juvenile Justice Act (“the AJJA”), codified at § 12-15-101 et seq., Ala.Code 1975. Section 12-15-65 was effective until January 1, 2009; the effective date of the AJJA is January 1, 2009.
 

 [7]
 

 . This court may affirm a judgment that is correct for any reason, even one not cited by the trial court.
 
 Boykin v. Magnolia Bay, Inc.,
 
 570 So.2d 639, 642 (Ala.1990).
 

 [8]
 

 . Section 26-18-7 was amended and renumbered effective January 1, 2009.
 
 See
 
 Act No. 2008-277, Ala. Acts 2008;
 
 see also
 
 note 6.
 

 [9]
 

 . The record does not indicate whether the mother has divorced J.W.
 

 [10]
 

 . The mother, in her brief on appeal, alleges that DHR failed to maintain contact with her. However, the testimony of the DHR social workers indicated that the mother lost contact with them for several months after the June 2007 domestic-violence incident and that they regained contact with her at an October 2007 review hearing. At that time, the mother and A.A. were unemployed and did not have housing.